# Kentucky Distilleries & Warehouse Company v. Warwick Company.

(Decided November 11, 1915.)

## Appeal from Madison Circuit Court.

1. Easements—Right to Not Waived by Request for Permission to Use.—If a person has the right to the use of a passway, the mere fact that he does not understand or appreciate the extent of his right and consequently seeks and obtains a permissive use, this effort to obtain permission will not deprive him of the use to which he was entitled without the permission.

2. Easements—Way of Necessity—When Implied.—Where land conveyed is entirely surrounded by lands of the grantor, the grant of a right-of-way as a necessity over the land of the grantor to and from the land conveyed will be implied as a matter of law.

3.  Easements—Abandonment of Right to.—But where the grantor conveys land to which the grantee has a way that furnishes him full and free access to the property conveyed, and the grantee thereafter voluntarily closes up this way or deprives himself of its use, he cannot by implication of law claim another right-of-way over the land of the grantor.

4.  Deeds—Appurtenances—Words and Phrases—Meaning of.—The word appurtenances in a deed is generally understood to mean the right to the use of those things that are essential to the full enjoyment of the premises conveyed and which were used as a necessary incident thereto at the time of the conveyance.

WM. MARSHALL BULLITT for appellant.

J. A. SULLIVAN and BARCLAY, ORTHWEIN & WALLACE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL.—Reversing on the original appeal and affirming on the cross-appeal.

The dispute in this case grows out of a controversy over the right claimed by the appellee, Warwick Company, to an easement over the land of the appellant, which will be called for convenience the Kentucky Company.

It appears that in 1871, or perhaps a few years before, the distillery now owned by the Kentucky Company was operated by W. S. Hume & Company. In 1882 the distillery now owned by the Warwick Company was built near to the distillery established by Hume & Company, and for a couple of years these two distilleries were owned and operated by the same people. In 1884 the distillery properties were separated, the Warwick Company distillery passing into the hands of the Bennetts and Burnams and what is now the Kentucky Company distillery into the hands of the Humes. In 1899 the Kentucky Company purchased the Hume distillery, and in 1906 the Bernheim Distillery Company became the owners of the Warwick Company. All of this property is situated immediately on the line of the Louisville & Nashville Railroad Company. One warehouse of the Warwick Company and the distillery plant proper of the Kentucky Company are situated on what may be called the east side of the railroad, and the distillery proper of the Warwick Company and some of its warehouses, as well as warehouses of the Kentucky Company, are situated on the west side of the railroad; but as this

controversy centers about the warehouse of the War-
wick Company which is situated on the east side of
the railroad, it will not be necessary to notice further
the location of the other buildings of either company.

This warehouse was originally erected in 1882. It
fronted immediately on the property line of the railroad
company and was surrounded on the other three sides
by the land of the Humes now owned by the Kentucky
Company. The building was in the shape of an ell and
occupied the whole of the lot that was conveyed to
the Warwick Company in 1884, when the distillery prop-
erties were divided, except that between the wall on the
north side and the property line on the north side
there was a vacant space several feet wide that extended
back about eighty feet to the ell. And in the end of this
ell that fronted on the vacant space there was a door.
The only other doors in the building were in the end
that opened on the right-of-way of the railroad, and ac-
cess to the interior of this warehouse was generally had
through these end doors, but occasionally the door in the
ell was used.

In 1907 the Warwick Company remodeled this old
warehouse building by making it several stories higher
and taking in the vacant strip of ground, so that the
exterior walls of the building covered the entire lot,
which was the only land owned by the Warwick Company
on the east side of the railroad. When this improve-
ment was made, the rear end of the building, that is, the
end farthest from the railroad, was converted into a
bottling house and separated from the warehouse proper
by a solid partition wall, and in the north wall of this
bottling room a door was made that furnished an en-
trance to the room. After the building had been thus
divided into a warehouse and a bottling house, access
could not be had to the bottling house through the ware-
house; and so it was necessary, in taking barrels of
whiskey from the warehouse to the bottling house to
be placed in bottles, to take the barrels out of the front
door of the warehouse and carry them around the out-
side wall to the door of the bottling house, and this of
course made it necessary to have a passway over the land
of the Kentucky Company.

Under the impression that it did not have the pass-
way as a matter of right over the land of the Kentucky
Company along the north wall of the warehouse from the

railroad to the door of the bottling house, in April, 1908, the Warwick Company wrote to the Kentucky Company a letter in which it said: ''The extreme end of the warehouse is to be used by us in the future for a bottling and bond plant. We are forced, however, to have an opening fronting on your property, and also obtain from your corporation sufficient room, say five to seven feet, on your property, so as to permit our constructing a gangway giving us access from the front to the rear end of our warehouse. We are willing, if it meets with your approval, either to buy the necessary land at a reasonable price or to lease it.''

In May, 1908, the Kentucky Company answered this letter and said: ''We are quite willing to give you ingress and egress to and from your bottling warehouse in the southeast corner of your warehouse adjoining our premises over a strip of land seven feet wide immediately northeast and alongside of said warehouse, upon conditions that said strip is not to be made a part of your distillery premises and that this consent to enable you to use same may be canceled at our pleasure.''

Acting under the authority of this consent, the Warwick Company constructed a platform about seven feet wide along the north side of the warehouse extending from the railroad to the door of the bottling department, and used this platform for the purpose of taking whiskey to and from the bottling house to the warehouse until 1911, when the Kentucky Company revoked the consent it had given to use this passway; and soon after that time this suit was brought by the Warwick Company to enjoin the Kentucky Company from interfering with its right to use this passway and to recover damages for its obstruction, which began when the license was revoked.

After the case was prepared for trial, the court adjudged that the Warwick Company was entitled to a passway leading from the right-of-way of the railroad along the north side of its warehouse to its bottling house in the end of the warehouse, and the Kentucky Company was enjoined from its obstruction. It was further adjudged that the Warwick Company should remove the plank platform placed on this passway after it obtained the consent before mentioned; and also adjudged that the Warwick Company was not entitled to any damages for the deprivation of the use of this passway during the time it was obstructed.

From this judgment the Kentucky Company appeals and the Warwick Company prosecutes a cross-appeal insisting that the court erred in not awarding it damages on account of the obstruction of its right to use the passway between the time of the obstruction and the filing of the suit, when the use of the passway was secured by a temporary injunction.

In the view we have of this case the only question that needs to be disposed of is the right of the Warwick Company to this passway. The Kentucky Company contends on this appeal that the use of this passway was merely permissive, and that it had the right to revoke, as it did, the privilege granted in the letter of May, 1908; while the Warwick Company insists that, independent of this permission, it had the right to the use of this passway, as the land over which it ran (1) had been dedicated to public use; (2) was granted to it by an implication of law; (3) was a way of necessity; (4) was conveyed to it under the term ''appurtenances'' used in the deed.

From the time these two distilleries were erected until the sale of what may be called the Hume property to the Kentucky Company in 1899, and the sale of what may be called the Bennett and Burnam Company to the Bernheims in 1906, they were owned by the Bennetts, Burnams and Humes, all of whom, aside from being related to each other, were on terms of intimacy; and during the time the property was owned by these people there appears to have been no objection by any of them to the use of the land of the other for passway purposes. It is further shown that probably as far back as 1880 the Humes had made for their convenience a passway or road extending from Silver Creek along the north side of this warehouse building to the railroad, and thence to the Richmond and Lancaster turnpike. After 1884, when the distillery property was divided and the warehouse in question passed into the hands of the Bennetts and Burnams, they had little occasion to use this road, which was on the land of the Humes and several feet from the north wall of the warehouse. The Bennetts and Burnams did not own any land on the east side of the railroad besides the lot on which this warehouse was situated, and access to the warehouse, except on rare occasions, was had through the doors in the end fronting on the railroad. Occasionally, however, use was made of the door in the end of the ell fronting on that

part of the lot not occupied by the warehouse building; but the use of this door was merely desultory and occasional, and there seems to have been no necessity for its use, as ample ingress and egress to and from the warehouse building could be had through the main entrance at the front. But when this entrance at the ell was used, there was no objection by the Humes to the use of this road that passed close by this entrance.

It is very clear, we think, from the evidence that the use of this road by the Bennetts and Burnams was entirely permissive. It was merely an occasional use by them, not a way of necessity, and this occasional use was never objected to by the Humes, who, as stated, were on terms of intimacy with the Burnams and Bennetts. The public generally did not use this road, as it passed entirely over the land of the Humes and was intended as a passway for the benefit of the farm and distillery properties owned by them. The only one of the public appearing to have claimed the right to use this road is a man named Baldwin, who, in 1905, purchased a part of the Hume farm and used this road, as he claimed, as a matter of right in going to and from his farm.

Our conclusion is, that the assertion of the Warwick Company, that this road was dedicated to the public and therefore it had the right to use it as a means of ingress and egress to and from its bottling house, is not sustained by the evidence. In reaching this conclusion we do not treat the letter of the Warwick Company, requesting permission to use this passway, as an acknowledgment that the right did not previously exist, or as a confession that the privilege of using it was obtained only by virtue of and under this written consent. It is, however, a circumstance tending to confirm our opinion that the Warwick Company recognized the fact that it was not entitled as a matter of right to the use of this passway, although not conclusive of this question. For if a person has the right to the use of a passway, the mere fact that he does not understand or appreciate the extent of his right, and consequently seeks and obtains a permissive use, his effort to obtain permission will not deprive him of the use to which he was entitled without the permission.

As we have stated, this entire lot is now occupied by the new warehouse, consisting of the warehouse proper

and the bottling house, and is surrounded on three sides by the land of the Kentucky Company, and the argument is made that where land conveyed is entirely surrounded by the lands of the grantor, the grant of a right-of-way as a necessity over the land of the grantor to and from the land conveyed will be implied as a matter of law. Estep v. Hammons, 104 Ky., 144; Brown v. Burkenmeyer, 9 Dana, 159; Beall v. Clore, 6 Bush, 676; Hall v. McLeod, 2 Met., 98.

We are not disposed to question the correctness of this principle, but do not find it applicable to the case we have. At the time the vendors of the Kentucky Company conveyed to the Warwick Company the land on which this warehouse was situated, it was not necessary to the use of the warehouse that there should be an entrance on the north side, or, indeed, on any side of the building except the end fronting on the railroad where the principal doors that opened into the warehouse were located. At this time the entire building was used for warehouse purposes, and full and free ingress and egress to and from all parts of the building could be had through the doors in the end fronting on the right-of-way of the railroad, and these doors, with rare exceptions, were used as a means of ingress and egress. But if it should be said that the door in the ell on the north side of the building was occasionally used, and that access to this door was necessary in the proper use of the building, the Warwick Company had access to this door over its own land. It could pass from the railroad over that part of its lot not occupied by the building and go into the door in the ell. It is true there was a coal shed and perhaps another little building on the end of this vacant space next to the railroad, but these buildings could easily have been taken away, and then there would have been ample room over its own land for access from the right-of-way of the railroad to this door in the ell.

There is, too, some claim that the use of the railroad right-of-way was merely permissive and that if the railroad should prevent the use of its right-of-way, ingress and egress to and from the building would be entirely closed unless it could be had along this passway. But we find no merit whatever in the claim that there is any probability that the right of ingress and egress over the right-of-way of the railroad will ever be interfered with. So that when the ground occupied by this

warehouse building was conveyed by the grantors of the Kentucky Company to the Warwick Company in 1884, and continually from that time until 1907, after the property had been acquired by the Burnheims, there was at all times an uninterrupted way of ingress and egress to and from this warehouse building, and all parts of it, without going upon the land of the grantor. But after the Burnheims acquired this property in 1906 they proceeded to rebuild and extend the walls of the warehouse until they covered the entire lot, leaving the doors in the end of the building fronting on the railroad as the only way of entrance to it unless a way was had over the land of the Kentucky Company. In addition to this, they converted the rear end of the warehouse building into a bottling house and built a solid wall between the warehouse proper and the bottling house, so that there was no way of getting to the bottling house except over the land of the Kentucky Company. It is, therefore, obvious that if the use of the passway over the land of the Kentucky Company is now necessary to give the Warwick Company access to its bottling house, this necessity was voluntarily created by the Warwick Company. A right-of-way over the land of the Kentucky Company was not necessary to the use of the warehouse or any part of it when the conveyance was made or until many years afterwards when the improvements were made.

Now we think that when a grantor conveys land to which the grantee has a way that furnishes him full and free access to the property conveyed, and the grantee thereafter voluntarily closes up this way or deprives himself of its use, he cannot claim by implication of law another right-of-way over the land of the grantor. 14 Cyc., 1175; Mitchell v. Seipel, 53 Md., 251, 36 Am. Rep., 404.

It is further said that as the deed to the Warwick Company conveyed the land and "all the appurtenances thereto belonging," the right to the use of this road passed as one of the appurtenances.

The word appurtenances is generally understood to mean the right to the use of those things that are essential to the full enjoyment of the premises conveyed and which were used as necessary incidents thereto at the time of the conveyance. Bouvier's Law Dictionary; Parsons v. Johnson, 68 N. Y., 62; 23 A. R., 149.

But as we have endeavored to point out, this passway was not necessary to the full enjoyment of the property conveyed at the time of the conveyance. It was not an incident or an appurtenance to it. It was not mentioned in any manner in the deed, and we may assume was not in the contemplation of the parties when the conveyance was made.

It is further suggested that the Kentucky Company is estopped to deny the Warwick Company the use of this passway upon the ground that the Kentucky Company saw the improvements being made by the Warwick Company and knew that these improvements would make indispensable this passway in the use of the bottling house, but did not intimate that it would attempt to deprive it of the use of the passway. A sufficient answer to the assertion of estoppel is that the Warwick Company obtained permission to use this passway with the express understanding that the permission might be revoked at any time. In view of this fact it cannot be said that the Warwick Company made the improvements ignorant of the fact that it might be deprived of the use of the passway at the will of the Kentucky Company.

Upon the whole case, our conclusion is that the judgment should be reversed on the original appeal and affirmed on the cross-appeal, with directions to enter a judgment dismissing the petition.